# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN DOUGLAS DUNMIRE, in his capacity as Trustee of the John Douglas Dunmire Revocable Trust, *et al.*; | ) ) ) ) | |
| Petitioners, | ) ) ) | |
| v. | ) ) | C.A. No. 10589-CB |
| FARMERS & MERCHANTS BANCORP OF WESTERN PENNSYLVANIA, INC., | ) ) ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted:  August 23, 2016
Date Decided: November 10, 2016

Edward M. McNally and Nicolas Krawitz of MORRIS JAMES LLP, Wilmington, Delaware; Shawn M. Perry of PERRY & PERRY, PLLP, Minneapolis, Minnesota; *Attorneys for Petitioners*.

Kenneth J. Nachbar, Ryan D. Stottmann, and Glenn R. McGillivray of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Respondent*.

**BOUCHARD, C.**

This is an appraisal action to determine the fair value of Farmers & Merchants Bancorp of Western Pennsylvania, Inc. ("F&M"), a small community bank located in Armstrong County, Pennsylvania. On October 1, 2014, F&M merged into NexTier, Inc., a community bank located in neighboring Butler County, Pennsylvania, in a stock-for-stock transaction (the "Merger"). The 2.17 exchange ratio impliedly valued NexTier at $180 per share and F&M at $83 per share. The Merger was not the product of a robust sale process. It was undertaken at the instance of the Snyder family, which controlled both F&M and NexTier and stood on both sides of the transaction. No other bidders for F&M were considered.

Petitioners' expert valued F&M at $137.97 per share, approximately 66% above the deal price. Respondent's expert valued F&M at $76.45 per share, almost 8% below the deal price.

For the reasons explained below, I conclude that the transaction price and certain of the methodologies the experts used are not reliable determinants of fair value, and that F&M's fair value most reliably can be determined using a discounted net income model that both experts utilized. Relying exclusively on that model, I conclude that the fair value of F&M shares as of the date of the Merger was $91.90 per share.

1

## I.    BACKGROUND

The facts recited in this opinion are my findings based on the stipulations of the parties, documentary evidence, and testimony presented during a three-day trial during which three fact and two expert witnesses testified.  The fact witnesses consisted of petitioner Paul Eugene Dunmire ("Gene Dunmire"); his son, petitioner John Douglas Dunmire ("Doug Dunmire"); and Richard Krauland, President and CEO of F&M at the time of the Merger.  I accord the evidence the weight and credibility I find it deserves.

### A.    The Parties

Respondent F&M, which is now known as NexTier, Inc., is a Delaware corporation headquartered in Pennsylvania.  Before the Merger, F&M was a community bank with eight branches in Armstrong County, Pennsylvania, focused on taking deposits from customers in the area and making loans to those customers and their businesses.  F&M had 767,799 outstanding shares at the time of the Merger, and $436,764,000 in total assets as of March 31, 2014.[1]

The petitioners consist of members of the Dunmire family who collectively held 138,720 shares of F&M as of the date of the Merger, individually or in their

---

[1] JX 11 at 3; JX 133 at 6.

capacity as trustees or custodians.[2]   The parties stipulated that these shares are eligible for appraisal.[3]

### B.    The Dunmire and Snyder Families

F&M was formed from the 2008 merger of Farmers Bank and Merchants Bank.  Doug Dunmire was a Merchants Bank director from the mid-90s until the 2008 merger, and sat on its compensation, personnel, and loan committees.[4] Doug's father, Gene, was President of Merchants Bank for approximately five years in the early 1980s, and was CEO and Chairman of Merchants Bank for approximately 25 years, from the early 1980s until 2007.[5]  Gene's grandfather first acquired an interest in Merchants Bank in 1929 or 1930 and became its President, and Gene's father was a member of the Merchants Bank board for approximately 70 years.[6]  The Dunmire family owned a controlling interest in Merchants Bank beginning in the 1950s.[7]

---

[2] Joint Pre-Trial Stipulation and Order ("PTO") ¶ II.1.

[3] *Id.* ¶ I.

[4] Trial Tr. ("Tr.") 7-8 (D. Dunmire).

[5] *Id.* at 199-200 (G. Dunmire).

[6] *Id.* at 198 (G. Dunmire).

[7] *Id.*

The Snyder family historically controlled F&M's other predecessor entity, Farmers Bank.[8] Farmers Bank was Merchants Bank's main competitor, and the two entities were located across the street from one another in Kittanning, Pennsylvania.[9] The Snyder family obtained control of Merchants Bank in 2007 after Gene Dunmire's brother, Phillip Lee Dunmire, sold his shares in Merchants Bank to the Snyder Group.[10]

In April 2007, the Snyders removed Gene Dunmire as President and Chairman of Merchants Bank.[11] Gene stayed on the board and his family remained significant stockholders of Merchants Bank.[12] The Snyder family merged Farmers Bank and Merchants Bank in 2008.[13] Richard Krauland, an experienced bank executive who had joined Farmers Bank as President and CEO in 2005, became

---

[8] *Id.* at 29-30 (D. Dunmire).

[9] *Id.* at 29-30 (D. Dunmire), 84-85 (Krauland).

[10] *Id.* at 199 (G. Dunmire).

[11] *Id.*

[12] *Id.* at 201.

[13] PTO ¶ II.4.

President and CEO of F&M. Gene Dunmire, Doug Dunmire, and Richard Krauland, all testified that the merger of the two competitors created synergies.[14]

## C. F&M's Growth Prospects

At formation, F&M had close to $100 million in excess deposits.[15] Because there was limited demand for loans in Armstrong County, F&M used those excess deposits to invest in loan participations with other lenders in other markets.[16] As a result, F&M's profits increased from $3.2 million in 2009 to nearly $4.7 million in 2012 and 2013.[17] The loan-to-deposit ratio also grew accordingly to nearly 90%, which Krauland regarded as a limit to prudent lending.[18]

F&M's growth prospects, however, were limited in at least two respects. First, as existing loans were paid off, they were replaced by lower-interest loans due to the post-recession low-interest-rate environment, compressing F&M's profit

---

[14] Tr. 31-32 (D. Dunmire) (acknowledging "the value that can be created when a bank like Farmers merges with a bank like Merchants"), 87-89 (Krauland) (discussing resulting synergies in detail), 207-08 (G. Dunmire) (answering that the Farmers and Merchants combination involved both "cost synergies and revenue synergies").

[15] *Id.* at 88 (Krauland).

[16] *Id.* at 94-96.

[17] JX 120 at F&M00014303.

[18] Tr. 96 (Krauland).

margins.[19]   Second, F&M was unable to attract new deposits from within Armstrong County, where it already held a dominant market share, due to a "shrinking population" and a weak economy.[20]   Krauland described F&M as "landlocked" in Armstrong County because there "wasn't much more room for growth."[21]

As part of its regular planning process, F&M management provided the board with a strategic plan approximately every three years that included a discussion of F&M's strengths and weaknesses, a financial forecast, and a list of potential opportunities.[22]   The 2012 Strategic Plan reported that the bank was doing "extremely well" financially,[23] but noted "its inability to grow much beyond its current level."[24]   Recognizing that the bank already was poised to reach its 90% loan-to-deposit ratio cap, management projected that the bank could grow at a

---

[19] *Id.* at 92, 114-16.

[20] *Id.* at 119-21, 132; *see also id.* at 556-58 (Van Vleet); JX 191 ("Van Vleet Rebuttal") ¶ 87 (describing negative growth in non-insider deposits from 2011-2013).

[21] Tr. 132 (Krauland).

[22] *Id.* at 91.

[23] JX 5 at F&M00007636.

[24] *Id.* at F&M00007638.

"normal inflationary rate of 3% per year,"[25] with essentially flat net income between 2012 and 2014.[26] The Strategic Plan identified the acquisition of a distressed bank as F&M's greatest opportunity to "break through [its] economic and geographic constraints."[27]

### D. F&M and NexTier Merge

In 2011, the Snyder family bought a controlling interest in NexTier, a community bank located in neighboring Butler County, Pennsylvania that had been hit hard by the financial crisis.[28] NexTier had entered into an agreement with bank regulators that required it to obtain a capital infusion.[29] After the Federal Deposit Insurance Corporation prevented NexTier's proposed merger with a third-party,[30] the Snyder family acquired NexTier at $175 per share.[31] Krauland, already CEO of F&M, became a board member of NexTier's holding company.[32]

---

[25] *Id.* at F&M00007636; Tr. 97-8 (Krauland).

[26] JX 7 at F&M00007138; Tr. 98-9 (Krauland).

[27] JX 5 at F&M00007638.

[28] Tr. 134-37 (Krauland).

[29] JX 133 at 38.

[30] *Id.*

[31] *Id.*

[32] *Id.*

On April 23, 2013, at a NexTier board meeting, Krauland provided a draft of a proposed plan for merging NexTier and F&M.[33] The NexTier board authorized management to move forward with discussions concerning a merger with F&M.

On May 7, 2013, at a regularly scheduled F&M board meeting, Krauland advised the board that preliminary merger planning had taken place between the management teams of F&M and NexTier. Recognizing "the ownership of members of the Snyder family in both companies," the F&M board formed a special committee (the "Special Committee") to make a recommendation to the full board regarding the price and form of consideration "F&M may be willing to pay to acquire NexTier."[34] The Special Committee consisted of Roger H. Claypoole, Gene Dunmire, and Edward Echnoz. Claypoole was the Chairman of the F&M board and a co-investor with the Snyders in a number of business ventures; Echnoz owned an insurance agency that sold insurance to some of the Snyders' companies.[35]

---

[33] *Id.* at 39.

[34] *Id.*

[35] JX 11 at PETITIONERS00005327; JX 31 at F&M00010300; Claypoole Dep. at 10, 48.

8

On May 17, 2013, NexTier engaged FinPro Capital Advisors, Inc. ("FinPro") as its financial advisor to evaluate a possible merger with F&M.[36] F&M engaged Ambassador Financial Group ("Ambassador") as its financial advisor, but only to "render an opinion as to the fairness of the exchange ratio that would be proposed by [FinPro] to the NexTier board."[37] Ambassador was not authorized to conduct an independent valuation.[38]

On July 18, 2013, FinPro presented to the NexTier special committee an analysis concluding that an exchange ratio between 1.8 and 2.0 shares of F&M common stock per NexTier stock would be appropriate.[39]

On July 19, 2013, the F&M Special Committee met to discuss the proposed combination. Krauland gave a presentation discussing the benefits to F&M of a merger with NexTier, noting that while F&M had maxed out its opportunities in Armstrong County, NexTier serves a high growth area in Pennsylvania.[40] According to the minutes, Krauland then delivered a message from the Snyders:

---

[36] JX 133 at 39.

[37] *Id.*

[38] *Id.* at 40.

[39] *Id.* at 39.

[40] JX 41 at 3.

9

Mr. Krauland next told the Committee that he was no longer speaking as an officer of F&M or of NexTier. He explained that he attended a meeting of the Snyder family two days ago and that he was asked to deliver a message from the Snyder family. Mr. Krauland stated that the Snyders paid $175/share to purchase NexTier in 2011, that they also paid to take bad assets off of the NexTier books and that they would like to get $180/share for NexTier. He explained that the Snyders felt that they have improved NexTier and positioned it for a merger, that they just wanted to recoup their full investment and that they would not be making a profit off of the sale.[41]

David Danielson of Ambassador then made a presentation to the Special Committee, noting at the outset that Ambassador had been "hired at a discount to only provide an opinion on the FinPro analysis."[42] After further explaining that Ambassador "has not yet analyzed the price of $180/share that the Snyder Group is requesting and that Ambassador has only analyzed the ratios proposed by FinPro," Danielson stated "that Ambassador viewed an exchange ratio of 1.8 to 2.0 as fair to the F&M common shareholders."[43] When Gene Dunmire asked whether he "could see the ratio going lower," Danielson "replied that he did not."[44] At the conclusion of the meeting, the Special Committee unanimously approved engaging

---

[41] *Id.*

[42] *Id.*

[43] *Id.* at 4.

[44] *Id.* at 5.

Ambassador "to complete further analysis" of the proposed transaction.[45]   On August 5, 2013, Ambassador executed a new engagement letter authorizing it to render a fairness opinion concerning the "consideration to be paid by F&M to NexTier stockholders pursuant to the transaction."[46]

On August 13, 2013, Ambassador provided the Special Committee with an updated top-level analysis of F&M and NexTier.[47]   Claypoole informed Ambassador that although their analysis used $175 per share for NexTier's value, NexTier would expect to be valued at $180 per share.[48]   Gene Dunmire commented that valuing NexTier at $180 "appears to be an unfair benefit to its shareholders," meaning the Snyders.[49]  Claypoole responded that "although it may appear that way, the NexTier shareholders are essentially just trying to get back the investment they initially put into it."[50]

---

[45] *Id.* at 6.

[46] JX 133 at 40.

[47] JX 61 at F&M00008378.

[48] *Id.*

[49] *Id.*

[50] *Id.*

11

On August 19, Ambassador presented to the Special Committee an analysis showing a valuation range for F&M stock of between $80 and $90 per share.[51] During that meeting, Gene Dunmire told the group that he believed a combination with NexTier to be a risky transaction, characterizing NexTier as a "sick and dying" company.[52]

On August 26, Ambassador recommended to the Special Committee a 2:1 exchange ratio that impliedly valued F&M at $85 per share.[53] Before the meeting, Gene Dunmire circulated to Claypoole and Echnoz a transaction overview with a 1.2:1 exchange ratio prepared by Macquarie Capital,[54] whom Gene had hired to provide a second opinion.[55] Gene asked the Special Committee to consider engaging Macquarie instead of Ambassador for the remainder of the negotiations, but the Special Committee declined to pursue this course. At the conclusion of the meeting, Claypoole asked Ambassador to prepare a letter of interest at a 2:1 exchange ratio valuing F&M at $85 per share, with the consideration to be paid

---

[51] JX 133 at 40.

[52] JX 63 at 3.

[53] JX 133 at 40.

[54] JX 68 at PETITIONERS00003614.

[55] JX 133 at 40.

85% in stock and 15% in cash.[56] Gene stated that this option was "far superior to an all-stock deal," but expressed concern that $85 per share "may not be high enough."[57]

On September 30, 2013, Claypoole e-mailed Gene Dunmire summarizing the Special Committee's 2:1 position and a 2.3:1 counterproposal from the Snyders.[58] In the margins of the email, next to "$170 for NexTier, $85 for F&M with an exchange ratio of 2 for 1," Gene wrote, "Stay w/ 2 for 1, yes/good," and next to the Snyders' 2.3:1 counterproposal, he wrote, "no."[59] During this period, the Snyders insisted on their exchange ratio of approximately 2.3:1 despite the Special Committee's opposition.[60] Claypoole told David Snyder on more than one occasion that the ratio David Snyder wanted was unacceptable.[61] Months later, in a May 3, 2014 email to F&M's counsel, Claypoole remarked on his "bigger

---

[56] JX 69 at F&M00008386.

[57] *Id.*

[58] JX 77 at PETITIONERS00005248.

[59] *Id.*

[60] Claypoole Dep. at 71-73, 77.

[61] *Id.* at 73.

13

frustration" with "Dave Snyder's fixation on the exchange ratio and total inflexibility to consider anyone's numbers but his own."[62]

At various times during the negotiations, Claypoole provided the Snyders and Krauland with updates on the Special Committee's internal deliberations. For instance, on October 9, 2013, two days before a Special Committee meeting, Claypoole e-mailed David Snyder describing the state of play within the Special Committee and his efforts to get "Gene on board:"

> I had hope [sic.] to have something to share by now. I do have a special committee conference call schedule [sic.] for Friday afternoon. I have been working with Danielson and [counsel] looking for ways to bring Gene on board. I shared the proposal we discussed with [Echnoz]. His comment is, the car is somewhat close to trade value. Gene however wants me to hire another valuation firm and to sue. I had [counsel] explain to Gene that will not happen and why. I would like to find a formula that gets all three votes and still meets the criteria for Snyder's [sic.]. I am leaning toward an all-stock deal from my position. If I have something to report I will call.[63]

At other times, Claypoole discussed Ambassador's analyses with the Snyders or Krauland before doing so with the rest of the Special Committee.[64]

---

[62] JX 112.

[63] JX 79.

[64] *See* JX 84 (December 13, 2013 Claypoole e-mail thread with Mark Snyder and Mark Karenchak, both of whom served on the boards of both F&M and NexTier); JX 112 (May 3, 2014 Claypoole email thread with Krauland).

14

At the beginning of December 2013, Ambassador prepared an updated analysis concluding that a 2.17 exchange ratio valuing F&M at $83 per share and NexTier at $180 per share was reasonable.[65] On December 23, at a meeting of the full F&M board, the Special Committee submitted a recommendation to send NexTier a letter of interest proposing an all-stock merger at a 2.17 exchange ratio.[66] The Special Committee's recommendation was not unanimous. Gene Dunmire voted against it. According to the minutes of the board meeting, "his reason for the 'no' vote was because he believes that the price for NexTier is well above fair market value and the means of payment should not be all cash, but a combination of cash and either notes, or bonds."[67] No action was taken on the Special Committee's recommendation for several months.

On May 7, 2014, the F&M Board approved a merger with NexTier at the 2.17 ratio discussed during its last meeting, with a proposed closing date of October 1, 2014.[68] Gene Dunmire did not vote because he was "not comfortable with the 2.17 ratio."[69] Later that day, Doug Dunmire, who had been asked by his

[65] JX 133 at 41.

[66] JX 89 at F&M00008362.

[67] *Id.*; *see also* Tr. 223, 252 (G. Dunmire).

[68] JX 116.

[69] *Id.* at F&M00001515.

father to help analyze the proposed transaction,[70] emailed members of his family describing the availability of dissenters' rights under Delaware law and attaching an analysis that shows "the prospect that we could cash out at $100/share" by pursuing a judicial appraisal.[71] Doug had previously prepared a spreadsheet that valued F&M at between $80.50 and $99.10 per share.[72]

On or about July 29, 2014, a joint proxy/consent solicitation statement and offering memorandum was disseminated to the stockholders of F&M and NexTier.[73] It stated that members of the Snyder family collectively owning more than a majority of F&M's outstanding shares already had adopted the merger agreement by written consent, satisfying the requirement for stockholder approval under the Delaware General Corporation Law.[74] It also informed F&M stockholders of their right to seek an appraisal of their shares. The Merger was consummated on October 1, 2014.[75]

---

[70] Tr. 41 (D. Dunmire), 228 (G. Dunmire).

[71] JX 115.

[72] JX 123.

[73] JX 133.

[74] *Id.* at F&M00039494.

[75] PTO ¶ II.7.

## E. Procedural Posture

On January 28, 2015, petitioners filed a petition for appraisal under 8 *Del. C.* § 262(c). Trial was held in June 2016, and post-trial argument occurred on August 23, 2016.

## II. ANALYSIS

In an appraisal action, the "Court shall determine the fair value of the shares exclusive of any element arising from the accomplishment or expectation of the merger."[76] The Court thus values the corporation as a going concern,[77] taking "into account all relevant factors."[78] In determining fair value, the Court has "significant discretion to use the valuation methods it deems appropriate, including the parties' proposed valuation frameworks, or one of the Court's own making."[79] "In an appraisal proceeding, the burden to establish fair value by a preponderance of the evidence rests on both the petitioner and the respondent."[80]

---

[76] 8 *Del. C.* § 262(h).

[77] *See M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del. 1999) (citing *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996)).

[78] 8 *Del. C.* § 262(h).

[79] *In re Appraisal of DFC Global Corp.*, 2015 WL 3753123, at *5 (Del. Ch. July 8, 2016).

[80] *Laidler v. Hesco Bastion Envtl., Inc.*, 2014 WL 1877536, at *6 (Del. Ch. May 2, 2014) (citing *M.G. Bancorporation*, 737 A.2d at 520).

## A. Overview of the Parties' Positions

This Court has remarked before on the tendency of litigants to submit wildly divergent valuations of the same company even when using similar methodologies.[81] This case is no different. Petitioners' expert, Joseph L. Hopkins, valued F&M at $137.97 per share,[82] approximately 66% above the deal price. Respondent's expert, Daniel R. VanVleet, valued F&M at $76.45 per share,[83] nearly 8% below the deal price.

Hopkins reached his conclusion of $137.97 per share based on a comparable transactions analysis in which he calculated the fair value of F&M by multiplying its 2013 net earnings by a P/E ratio derived from the prices paid for eight community banks. As a cross-check, Hopkins conducted a discounted future benefits analysis using F&M's 2013 adjusted net earnings as his starting point. A discounted future benefits model differs from a typical discounted cash flow model "in that it does not adjust net income for non-cash income and expenses and does

---

[81] *See, e.g.*, *In re ISN Software Corp. Appraisal Litigation*, 2016 WL 4275388, at *2 (Del. Ch. Aug. 11, 2016) ("it is quite common for the petitioner's expert in an appraisal to reach a DCF value twice that arrived at by the respondent's expert").

[82] JX 187 ("Hopkins Report") ¶ 162.

[83] JX 193 ("Van Vleet Report") ¶ 135.

not consider cash outflows for capital goods."[84] Hopkins' discounted future benefits model yielded a value of $139.45 per share after certain adjustments.[85]

Van Vleet used three valuation methods that he weighted equally to arrive at his valuation of $76.45 per share: (1) a capitalized net income method based on F&M's projected net income for the twelve months ended September 30, 2015, (2) a comparable transactions analysis, and (3) a guideline public company analysis. Respondent also advocates that the price attributed to F&M in the Merger provides a strong indication of fair value.

Although there are some math differences between Hopkins' discounted future benefit analysis and VanVleet's capitalized net income method, they are substantively the same in that they both derive a value for F&M based on a single year of net earnings to project an earnings stream using a constant long-term growth rate, and they both use the Capital Asset Pricing Model to derive a discount rate in order to determine the present value of that earnings stream.[86] For the

---

[84] Hopkins Report ¶ 105.

[85] Hopkins Report ¶ 157.

[86] Hopkins' discounted future benefits analysis projected F&M's net earnings for a discrete period of five years (2014-2019) using a constant growth rate (4.375%), and calculated a terminal value using the same growth rate. Hopkins Report ¶ 155. VanVleet's capitalized net income method capitalized a single year of earnings at the discount rate minus a long-term expected growth rate. Van Vleet Report ¶ 78. Because Hopkins used the same growth rate for both the discrete period and his terminal value calculation, his methodology mathematically would yield the same result as VanVleet's

reasons explained below, I conclude that this methodology, which I refer to as a discounted net income analysis, provides the most reliable method for determining the fair value of F&M as of the Merger. I start by explaining why I believe the transaction price and the other analyses the experts used are not reliable in this case.

## B.     The Merger Price is Not A Reliable Indicator of Value

In past appraisal actions, this Court has found the merger price to be the "best evidence of fair value" when the transaction "resulted from a competitive and fair auction, which followed a more-than-adequate sales process and involved broad dissemination of confidential information to a large number of prospective buyers."[87] As the Court stated in *Highlands Capital*:

---

capitalized net income method, assuming the same inputs are used. Tr. 551-52 (VanVleet) (Explaining that if one uses the same growth rate in perpetuity, "[y]ou should come up with an identical indication of value whether you do it over a five-year discrete period with a terminal calculation or whether you just look at a one year-projection and then use the capitalization method.").

[87] *Union Illinois 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 358 (Del. Ch. 2004) (appraising company at the merger price minus synergies); *see also, e.g.*, *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *15 (Del. Ch. Nov. 1, 2013) (holding that deal price is fair value after finding deal price to be reliable and that parties failed to present a reasonable alternative, and allowing parties to "supplement the record to account for portions of the sales price representing the synergy value of the transaction, if any"), *aff'd,* 2015 WL 631586 (Del. Feb. 12, 2015); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991) (holding, in a non-appraisal context, that the merger price satisfies entire fairness and that "[t]he most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . .

20

> If . . . the transaction giving rise to the appraisal resulted from an arm's-length process between two independent parties, and if no structural impediments existed that might materially distort 'the crucible of objective market reality,' a reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value.[88]

This Court has found the merger price to be particularly probative of fair value when the proper inputs for an independent valuation are uncertain and the Court's own analysis has produced the same approximate outcome.[89]

Relying on these authorities, respondent asserts that the $83 per share price attributed to F&M in determining the exchange ratio for the Merger "provides a strong indication of the value of F&M" that "may be relied upon by the Court to set the appraisal value."[90] Although the rationale of the cases finding the merger price to reliably indicate fair value makes eminent sense, I disagree that it is reliable under the present circumstances.

To start, the Merger was not the product of an auction. No third parties were solicited and no confidential information was disseminated to any other potential

---

was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available).

[88] *Highfields Capital, Ltd. V. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007).

[89] *See In re Appraisal of Ancestry.com*, 2015 WL 399726, at *23 (Del. Ch. Jan. 30, 2015) (finding that fair value is best represented by the market price where the inputs to a discounted cash flow analysis are "problematic" but the sales process was "robust").

[90] Resp't's Post-Trial Opening Br. at 18.

buyer. F&M explored the Merger at the instance of the Snyder family, which controlled both F&M and NexTier at the time of the Merger and stood on both sides of the transaction. Although a Special Committee of the F&M board was formed for the ostensible purpose of establishing an independent group to negotiate on behalf of F&M's minority stockholders, the record does not inspire confidence that the negotiations were truly arms-length.

The transaction was not conditioned on obtaining the approval of a majority of the minority stockholders of F&M. Two of the three members of the Special Committee (Claypoole and Echnoz) had business ties with the Snyders. During the first three months of the negotiations, the role of the Special Committee's financial advisor, Ambassador, curiously was limited to reacting to FinPro's work for NexTier rather than independently valuing F&M. And Claypoole, who was chairman of the full F&M board and appeared to serve as the functional chairman of the Special Committee, reported the Special Committee's internal deliberations to the Snyders and appeared to be working toward a price that would meet the Snyders' objective to recoup their original investment in NexTier, rather than aggressively looking out for the interests of F&M's minority stockholders. Given these circumstances, I place no weight on the Merger price as an indicator of fair value.

### C. Hopkins' Comparable Transactions Analysis

The sole methodology Hopkins used to determine the fair value of F&M as of the Merger was a comparable transactions analysis. Starting with a universe of 160 community banks that had been acquired within 21 months of the Merger, Hopkins selected eight banks he believed to be comparable to F&M. Using the prices paid to acquire these eight banks, Hopkins calculated that the median P/E ratio for his comparison set was 20.30. Applying this ratio to the adjusted estimated earnings of F&M for 2013, adding an amount to account for F&M's excess capital, and after making certain other adjustments, Hopkins computed that the fair value of F&M as of the Merger was $137.97.[91]

Although the eight banks Hopkins selected appear to provide a good basis for comparison to F&M, I lack confidence in the reliability of his analysis because he did not adjust for synergies potentially incorporated in the merger prices of those eight transactions and failed to provide a convincing explanation for why such an adjustment should not have been made despite significant evidence to the contrary.

Under Section 262, "fair value" means "the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an

---

[91] Hopkins Report ¶¶ 95-99.

acquisition or other transaction."[92]  This Court relatedly has recognized that '[i]n an arm's-length, synergistic transaction, the deal price generally will exceed fair value because target fiduciaries bargain for a premium that includes . . . a share of the anticipated synergies."[93]  Indeed, "the ability of target fiduciaries to obtain a premium to market implies that they successfully extracted a portion of the value that the acquirer planned to create and that the merger consideration therefore exceeds the fair value of the standalone entity as a going concern."[94]  Academic literature supports the proposition that targets often capture a portion of expected transaction synergies.[95]

---

[92] *Golden Telecom, Inc. v. Global GT L.P.*, 11 A.3d 214, 217 (Del. 2010); *see also M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

[93] *Olson v. EV3, Inc.*, 2011 WL 704409, at *10 (Del. Ch. Feb. 21, 2011).

[94] *Id.*; *see also In re Appraisal of Dell, Inc.*, 2016 WL 3186538, at *25 (Del. Ch. May 31, 2016) (noting "the recognized problem that an arms' length deal price often includes synergies"); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *16 (Del. Ch. Apr. 30, 2015) ("Understanding that . . . synergies may have been captured by the sellers in the case of a strategic acquirer is easily comprehended[.]").

[95] *See, e.g.*, Kenneth R. Ahern, *Bargaining Power and Industry Dependence in Mergers*, 103 J. Fin. Econs. 530, 547 (2012) (showing that targets capture on average "modestly more" of the merger gains than buyers); Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the 'Implicit Minority Discount' in Delaware Appraisal Law*, 156 U. Pa. L. Rev. 1 (2007) ("In an arm's-length transaction, an acquirer will pay a premium to [the equity value] in purchasing the firm.  The premium largely reflects synergies arising from the merger, but it can also reflect benefits of control."); Bos. Consulting Grp. & Technishe Universitat Munchen, *Divide and Conquer: How Succesful M&A Deals Split the Synergies*, at 9 (Mar. 2013) ("To arrive at a transaction price acceptable to the seller, in most cases, the acquirer must agree to share expected

Hopkins initially testified that he did not know whether the deal prices of any of the eight comparable transactions he selected had synergies priced in, and that he had done nothing to determine the answer.[96] In preparing his analysis, Hopkins simply "went in with the assumption that bankers who buy other banks don't pay for synergies."[97] Hopkins admitted that this view was based upon nothing more than his own anecdotal experience, and that he could not identify any academic literature to support his view.[98]

Respondents submitted substantial evidence at trial undermining Hopkins' view concerning the lack of synergies in deal prices for community banks generally and for the eight transactions Hopkins selected for his analysis.[99] All the

---

synergies. . . . [T]he seller's share has been trending upward during the past several years—to a current median of 31 percent—indicating that sellers have grown more sophisticated in assessing the synergy potential of their assets."); Sayan Chatterjee, *Types of Synergies and Economic Value: The Impact of Acquisitions on Merging and Rival Firms*, 7 Strategic Mgmt. J. 119, 133-34 (1986) (noting that "[t]he total wealth gain is likely to be divided equally between the acquiring and target firms unless one party in the merger has greater bargaining leverage").

[96] Tr. 374-75 (Hopkins).

[97] *Id.* at 376.

[98] *Id.* at 475-76.

[99] Petitioners contend it was respondent's burden to prove that synergies existed and affected the deal price for the comparable transactions Hopkins selected. But the issue here is the validity of Hopkins' own analysis, and under Delaware law "[e]ach party . . . bears the burden of proving a valuation position by a preponderance of the evidence, including the propriety of a particular method." *Dell*, 2016 WL 3186538, at *20. At any

fact witnesses who testified at trial, each of whom has significant community banking experience, testified that there are synergies when community banks merge,[100] as did the financial advisors who advised F&M and NexTier in connection with the Merger.[101] The merger of Farmers Bank and Merchants Bank itself was premised on synergies,[102] and Krauland testified that the F&M and NexTier deal similarly involved synergies.[103]

The press releases announcing each of the eight comparable transactions in Hopkins' comparison set touted potential synergies,[104] the proxy statements for six of them (*i.e.*, the ones that involved public acquirers) described potential synergies,[105] and reports for five of them from "the largest and best banking database service in the country" according to Hopkins[106] identified estimated cost

---

rate, even if petitioners' burden-of-proof theory was correct, respondent has carried that burden.

[100] *See* Tr. 36 (D. Dunmire), 141-42 (Krauland), 202-07 (G. Dunmire).

[101] Musso Dep. 48; Danielson Dep. 100.

[102] *See* Tr. 87-89, 146-48 (Krauland), 207-08 (G. Dunmire).

[103] *See* Tr. 139-42, 158, 195-96.

[104] JX 6, 9, 16, 33, 100, 102, 107, 111.

[105] JX 19 at 48-49; JX 25 at 27-29; JX 106 at 33-34; JX 110 at RESPONDENT_EXP00000003; JX 128 at 1; JX 136 at 30-31.

[106] Tr. 276 (Hopkins).

savings.[107]   Confronted with this evidence, Hopkins ultimately conceded that all eight of his comparables involved "some estimated cost savings," and that some also involved the potential for "revenue enhancements, selling new product[s], increasing market share, [and] increasing lending limits."[108]

As noted above, the Court's task in a Section 262 appraisal action is to determine the going concern value of the enterprise as of the merger date exclusive of any element of value—such as the value of achieving expected synergies—from the accomplishment of the merger.   Given the significant amount of evidence suggesting that the acquirers in the eight transactions Hopkins used in his analysis expected to achieve synergies, and the logical inference supported by case authority and academic literature that the prices for those transactions thus included some amount attributable to expected synergies, it is likely in my view that the methodology Hopkins used to derive a value for F&M materially overstated the going concern value of F&M.   Accordingly, I place no weight on Hopkins' comparable transaction analysis.[109]

---

[107] *See* JX 229, 231, 233, 235, 236.  The estimated cost savings for the five deals reflected in those exhibits are summarized in Resp't's Post-Trial Opening Br. at 21-22.

[108] *See* Tr. 420 (Hopkins).

[109] Petitioners argue in the alternative that I should account for the effect of potential synergies in Hopkins's comparable transaction valuation either by reducing the weight given to his analysis or by making an adjustment "for potential synergies of around 5% to 10%."  Pet'rs' Opening Post-Trial Br. at 31.  I decline to go down that road for lack of

### D. Van Vleet's M&A and Guideline Public Company Analyses

Two of the three methodologies VanVleet utilized to value F&M were based on multiples he derived from comparable transactions involving five community banks (M&A method) and the public trading prices for ten other community banks (guideline public company method). The multiples VanVleet used reflect the ratio of the market value for each comparable bank divided by its (1) book value, (2) tangible book value, and (3) adjusted earnings before taxes.[110] Both of these methods suffer from flaws or limitations that call into question their reliability.

It is unclear why Van Vleet chose the comparables he did for his M&A analysis. Using Van Vleet's filters, Hopkins found that Van Vleet excluded from his pool of choices fifteen banks within the same geographic region of the banks Van Vleet ultimately selected,[111] and that adding those banks to the mix would have raised the average P/E ratio significantly.[112] Despite emphasizing the importance of focusing on Pennsylvania banks in selecting comparables,[113] Van

---

any principled basis by which to determine the amount of weight to give Hopkins' analysis or to determine the appropriate level of an adjustment for potential synergies.

[110] *See* Van Vleet Report ¶¶ 97-114 (guideline public company analysis), ¶¶ 115-133 (M&A analysis).

[111] JX 190 ("Hopkins Rebuttal") ¶¶ 74-79.

[112] *Id.* ¶ 79.

[113] Tr. 511-12 (Van Vleet).

Vleet added a fifth bank from Maryland located in the heart of the Washington, D.C. metro area[114] even though VanVleet's selection criteria required the exclusion of banks in major metro areas.[115] Furthermore, one of Van Vleet's four other comparables maintained multiple branches in another major metro area, Philadelphia.[116] Tellingly, respondent essentially abandoned Van Vleet's M&A method in post-trial briefing.[117] This Court has declined to use a comparative analysis when there is doubt as to the appropriateness of the selected comparables.[118] Here, too much doubt exists over the appropriateness of the comparables VanVleet selected to place any reliance on his M&A method.

Turning to VanVleet's guideline public company valuation, Shannon Pratt notes that the more actively traded the chosen guideline companies, the better, and that "confidence [in a guideline analysis] rises sharply when we can find four to

---

[114] *See* JX 109.

[115] Van Vleet Report ¶ 116.

[116] *See* JX 126.

[117] *See* Resp't's Post-Trial Opening Br. at 55 n.21 (footnote defense of Van Vleet's choice of a Maryland bank); *see generally* Resp't's Answering Br. (no defense of the M&A method).

[118] *See, e.g.*, *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 915-16 (Del. Ch. 1999).

seven good guideline publicly traded companies."[119]   Van Vleet cautioned in his report that transactions in illiquid shares "are not indicative of either fair market value or fair value."[120]    An FDIC Community Banking Study published in December 2012 found that 84% of community banks are not publicly traded, and those that are tend not to be traded on major exchanges.[121]   "As a result, even the publicly traded shares of community banks tend to be less liquid than the shares of noncommunity banks."[122]   The record also shows that the ten banks Van Vleet selected as guideline public companies have low trading volumes.  One of them traded as low as 217 shares per day, and none of them had average daily trading volumes over 0.06% of their outstanding shares.[123]   "[A]s this court has held in the past, reliance on a price determined in a thinly traded, illiquid, market is evidence

---

[119] Shannon Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, at 274 (5th ed. 2008) ("Pratt").

[120] Van Vleet Report ¶ 140.

[121] *See* JX 12 at 6:5.

[122] *Id.*

[123] *See* Hopkins Rebuttal ¶ 51, App. B.

of a price's unfairness."[124]   The low-volume makeup of Van Vleet's guideline banks gives me sufficient pause not to rely on this measure of value.[125]

### E.    Discounted Net Income Analysis

Unlike the other methodologies discussed above, the parties agree that the fair value of F&M reliably can be determined in a discounted net income analysis that (1) projects a stream of earnings for F&M using a single year of its earnings as a starting point and applying a constant long-term growth rate, (2) determines the present value of that earnings stream using a discount rate calculated in accordance with Capital Asset Pricing Model, and (3) applies certain adjustments based on F&M's capital structure, principally to account for excess cash on its balance sheet.   Given the parties' agreement on this methodology, and because I have concluded that the parties' other approaches are not sufficiently reliable for the

---

[124] *Gesoff v. IIC Indus. Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) (combined fiduciary duty and appraisal case).

[125] Petitioners also question whether Van Vleet's analysis should have been adjusted to account for an inherent minority discount.  As this Court has remarked, "scholars have raised fair questions about the origins and rationale underlying the implicit minority discount." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 71 n.46 (Del. Ch. 2013) (citing Hamermesh & Wachter, *supra*).  Since I decline to adopt Van Vleet's guideline public company analysis, I do not address this issue.

reasons previously explained, I rely on the discounted net income method exclusively.[126]

The four basic inputs for this methodology are (1) the projected net income of F&M for the twelve month period after the closing of the Merger, (2) the discount rate, (3) the growth rate, and (4) the amount of any adjustments. In the following analysis, I evaluate each of these variables in turn with an eye to utilizing data in the Duff and Phelps 2014 Valuation Handbooks (hereafter, the "D&P Handbook")[127] where possible to maintain consistency in the analysis.

## 1. Net Income

F&M's management did not prepare multi-year projections of F&M's expected financial performance for the period after the October 1, 2014 closing. As a result, both parties utilized a single year of F&M's earnings as a starting point for their discounted net income models. For his starting point, Hopkins assumed F&M's net earnings for calendar year 2014 would be the same as its adjusted 2013

---

[126] The mathematical formula for this analysis, which is the one VanVleet used, is as follows: present value = (post-closing twelve-month net income) x $[(1 + \text{discount rate})^{0.5} \div (\text{discount rate} - \text{growth rate})]$. This variation of the usual Gordon-Growth formula adjusts for mid-year rather than year-end discounting. Pratt at 250.

[127] Duff & Phelps, LLC, *2014 Valuation Handbook: Guide to Cost of Capital* (2014) ("*Guide to Cost of Capital*"); Duff & Phelps LLC, *2014 Valuation Handbook: Industry Cost of Capital* (2014) ("*Industry Cost of Capital*").

net income of $4,825,000.[128] Van Vleet, on the other hand, started with F&M's twelve-month net income for the 12-month period ending September 30, 2015, one year after the Merger closed, which he calculated to be $5,063,338.[129]

I adopt Van Vleet's net income estimate, which petitioners do not challenge, for several reasons. First, Hopkins' estimate unrealistically assumes no income growth for F&M between the end of calendar year 2013 and the closing date of the Merger in 2014.[130] Second, Van Vleet's figure is corroborated by a management income projection prepared for budgeting purposes.[131] Third, VanVleet's estimate is based on the correct time frame, *i.e.*, F&M's projected post-closing net income for the twelve months after the Merger closed.[132]

## 2. The Discount Rate

Both of the parties' experts used the build-up method to calculate a discount rate using the Capital Asset Pricing Model.[133] The experts ultimately agreed that

---

[128] Hopkins Report ¶¶ 107-09.

[129] Van Vleet Report ¶¶ 82-89.

[130] Hopkins Report ¶ 109.

[131] Van Vleet Report ¶¶ 82-89.

[132] *See* Pratt at 250 (specifying that the initial input should be the expected economic income in the full period immediately following the valuation date).

[133] The Capital Asset Pricing Model is as follows: discount rate = $r_f + \beta \, (r_m - r_f) + ssrp$; where $r_f$ = risk-free rate of return; $r_m - r_f$ = equity risk premium, the expected return on a

the appropriate risk-free rate to use is 2.87%, which is the closing-date yield of a 20-year United States treasury bond.[134] This metric is typically used "when developing a U.S. dollar-denominated cost of equity capital,"[135] and corresponds to the methodology in the D&P Handbook, which provides estimates for the equity risk premium "relative to 20-year U.S. government bonds rates."[136]

The experts also agreed on using a size premium of 3.87% from the D&P Handbook for companies falling within the aggregate 9th and 10th deciles as measured by market capitalization.[137] According to the D&P Handbook, this size premium is an "Ordinary Least Squares" or "OLS" based size premium and should be paired with an OLS beta.[138]

---

broad portfolio of stocks in the market less the risk-free rate; β = beta, the volatility or systemic risk of the specific equity investment measured vis-à-vis the market; and ssrp = small stock risk premium, the additional expected return for small companies. Hopkins Report ¶¶ 118-23; Van Vleet Report ¶¶ 90-93.

[134] Van Vleet Report ¶ 92; Tr. 457 (Hopkins).

[135] *Guide to Cost of Capital* 3:2.

[136] *Id.* 3:11; *see also id.* 3:1 ("ERP estimates are, by definition, developed *in relation* to the risk-free rate. . . . [T]he term of the risk-free rate should . . . match the term of the risk-free rate used to develop the ERP").

[137] Hopkins Report ¶ 145; Van Vleet Report ¶ 92.

[138] *Guide to Cost of Capital* Exhibit 4.7 & 4:10-11 ("whatever type of beta you ultimately choose to employ, you should match the source of the size premium (OLS or sum beta) with the type of beta estimate you have chosen for your subject company. For example, for internal consistency, one should use a size premium derived using an OLS beta when

Based on the parties' agreement on the risk-free rate and the size premium, which come directly from the D&P Handbook and are ostensibly reasonable, I use a 2.87% risk-free rate and a 3.87% OLS-based size premium.[139]

The parties strongly disagree over the remaining inputs necessary to calculate a discount rate, namely the equity risk premium ("ERP") and beta. Hopkins paired a 0.88 beta calculated from a community bank ETF with a 3.55% ERP from an online survey of corporate executives conducted by two Duke University professors (the "Duke Study").[140] Relying on the D&P Handbook, Van Vleet used a 1.0 beta with a long-term supply-side ERP of 6.18%. From those variables, Hopkins arrived at a discount rate of 9.51%, and Van Vleet 13%.

---

the subject company beta is an OLS beta, and one should use a size premium derived using sum betas when the subject company beta is a sum beta."); *see also* Tr. 715 (Hopkins).

[139] The use of a size premium is a subject of some controversy. *See, e.g., Guide to Cost of Capital* 4:8 ("In fact, some commentators contend that the historical data are so flawed that valuation analysts can dismiss all research results that support the size effect. For example, is the size effect merely the result of not measuring beta correctly? Are there market anomalies that simply cause the size effect to appear? Is size just a proxy for one or more factors correlated with size, suggesting that valuation analysts should use those factors directly rather than size to measure risk? Is the size effect hidden because of unexpected events?"); *see also* Hopkins Report ¶¶ 138-45. I express no opinion on this debate. My use of a size premium simply follows from the fact that it is integral to the methodologies both experts utilized, from which my own determination of the discount rate is derived.

[140] *See* Hopkins Report ¶¶ 125-30; JX 181.

### a. Equity Risk Premium

Van Vleet's 6.18% ERP is more reliable in my opinion than Hopkins' 3.55% ERP. The source for Hopkins' estimate, the Duke Study, is an online questionnaire that asked chief financial officers and other executives for their "best guess" as to the average annual return of the S&P 500 over the next decade.[141] The Duke Study is not widely used; petitioners, in fact, were unable to identify any court that has adopted its findings. Petitioners' selection also reflects a significant departure from the 5 to 7% range of ERPs used in this Court's recent appraisal decisions.[142]

Petitioners offer no justification for why it would be more appropriate to use data from an internet survey than the ERP options compiled in the D&P Handbook, an established and familiar source of information for valuing a

---

[141] JX 181 at 19.

[142] *See Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 516 (Del. Ch. 2010) (using a 6.0% ERP and finding that "current academic thinking puts the ERP closer to 6.0% than to 7.1%"), *aff'd*, 11 A.3d 214 (Del. 2010); *DFC Global*, 2016 WL 3753123, at *7 (6.18%); *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *18 (Del. Ch. July 8, 2013) (5.20%), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013); *IQ Holdings, Inc. v. Am. Commercial Lines Inc.*, 2013 WL 4056207, at *4 (Del. Ch. Mar. 18, 2013) (5.5%), *aff'd*, 80 A.3d 959 (Del. 2013); *Orchard Enterprises,* 2012 WL 2923305, at *19 (5.2%). *See also* JPMorgan, *The Most Important Number in Finance: The Quest for the Market Risk Premium*, 2 (May 2008) (estimating ERP at 5-7%).

corporation that Hopkins considers authoritative.[143]  In addition to using a reliable source for his ERP, VanVleet selected a supply-side ERP (6.18%) rather than the higher historical ERP (6.96%) in the Handbook.  This selection is faithful to then-Vice Chancellor Strine's observations in *Golden Telecom* that there is "substantial support in the professional and academic valuation literature" for using the long-term supply-side ERP over historic ERP, and that "the relevant academic and professional community—and not this court—should develop the accepted approach."[144]

In sum, the long-term supply-side ERP of 6.18% that VanVleet selected comes directly from a reliable source—the D&P Handbook—and falls within the 5 to 7% range noted above.[145]  The rationale behind Hopkins' adoption of a significantly lower ERP from the Duke Study, by contrast, is not apparent beyond the fact that it provides a better outcome for petitioners.  I therefore adopt respondent's 6.18% ERP.

---

[143] Tr. 465, 709 (Hopkins).

[144] *Id.* at 516-17.

[145] Petitioners point out that if respondent is to rely on the D&P Handbook, then respondent should have used the conditional 5.0% ERP it recommends. *Guide to Cost of Capital* 3:21-23.  The use of that figure, however, is predicated on the use of a 4.0% risk-free rate that neither party advocates. *Id.* at 3:23.

### b. Beta

Van Vleet's discount rate calculation utilizes a 1.0 beta that, according to his opening report, is "based on data" in the D&P Handbook for the Standard Industrial Classification ("SIC") code 602.[146] SIC code 602 is comprised of 213 commercial banks and trust companies engaged in the business of accepting deposits from the public with sales ranging from $10.9 million to $105.8 billion, and assets ranging from $40.9 million to $2.4 trillion.[147] The lowest decile within SIC code 602, the "Small Composite" group, consists of 21 banks that range in size from $341 million to $672 million in assets.[148] In total, the D&P Handbook lists 60 different betas within SIC code 602, half of which are levered betas that are higher by a significant margin than the comparable unlevered betas that make up the other half.[149]

Van Vleet did not select a particular beta from the 60 different betas listed in the D&P Handbook for SIC code 602. Instead, he landed on a beta of 1.0 by "eye-balling" the median of the levered Blume adjusted, Vasicek adjusted, and sum

---

[146] Van Vleet Report ¶ 92(c).

[147] *Industry Cost of Capital* SIC 602.

[148] Hopikins Rebuttal ¶ 22; *see also* Tr. 710 (Hopkins).

[149] *Industry Cost of Capital* SIC 602.

betas reported in the D&P Handbook for SIC code 602,[150] which, according to Van Vleet, "are all generally in around the 1.0 range."[151] Asked why he focused on the median betas instead of the "Small Composite" betas, Van Vleet explained that his focus was on determining "what the equity rate of return would be for the commercial banking industry in general" and that he "dealt with the size issue by applying a small stock premium to that indication."[152]

Hopkins used a 0.88 beta calculated from a bank ETF fund called the First Trust NASDAQ ABA Community Bank ETF ("QABA"). As of November 2015, this fund included 139 regional community banks from around the United States.[153] Hopkins did not offer any further explanation for how the QABA beta was calculated, and its methodology is not apparent from the single page of the QABA investment analyst report that is in the record.[154] Thus, there is no way to tell from the record whether the QABA beta is an OLS, sum or other kind of beta.

---

[150] Tr. 574-75, 673 (Van Vleet); Tr. 701-2 (Hopkins).

[151] Van Vleet Dep. 115-17.

[152] Tr. 580 (Van Vleet).

[153] Hopkins Report ¶ 134.

[154] Hopkins Report App. L.

Respondent concedes that the 0.88 beta Hopkins selected is "defensible" and does not oppose using it in conjunction with an ERP of 6.18%.[155] Hopkins selected this beta, however, assuming a much lower ERP of 3.55%, which I have rejected for the reasons explained above. Indeed, in an apparent expression of buyer's remorse, petitioner candidly acknowledged that Hopkins used a "low ERP" and tried to "balance it out" by selecting a higher beta than may have been appropriate.[156]

Despite respondent's endorsement of the 0.88 beta from QABA, I decline to adopt it here. The D&P Handbook explains that "whatever type of beta you ultimately choose to employ, you should match the source of the size premium (OLS or sum beta) with the type of beta estimate you have chosen for your subject company."[157] As noted above, the size premium the parties agree on and that I have adopted is an OLS-based size premium, but I cannot tell from the record whether or not the QABA beta is an OLS beta. Thus, although the QABA beta generally seems suited for an analysis involving community banks, it does not fit the analysis here.

---

[155] *See* Resp't's Post-Trial Opening Br. at 36; Resp't's Post-Trial Answering Br. at 11.

[156] Hearing Tr. 22 (Aug. 23, 2016).

[157] *Guide to Cost of Capital* 4:11.

The 1.0 beta VanVleet selected also is not appropriate in my view. The D&P Handbook explains that "[a]n unlevered beta is the beta that would be expected if a company were financed only with equity capital."[158] As of December 31, 2012, F&M's only debt was negligible, consisting of a $713,415 interest-free loan at the holding company level for its holding company subsidiary.[159] Hopkins persuasively explained that, given its virtually debt-free capital structure, it would be inappropriate to use a levered beta to value F&M.[160]

Having rejected the primary position each of the parties' asserted for selecting a beta, essentially two options remain. Fortunately, both options are rooted in data from the D&P Handbook, which has the virtue of affording a measure of internal consistency given that the ERP and size premium I have adopted to calculate the discount rate also come from that source.

The first option, which generally follows VanVleet's approach, is to select a median beta from the universe of banks in SIC code 602, but from the unlevered betas listed there instead of the levered betas. The median raw OLS-based

---

[158] *Industry Cost of Capital* at 29.

[159] *See* JX 11 at 44; Tr. 708 (Hopkins); Hopkins Rebuttal ¶ 34.

[160] Tr. 707-8 (Hopkins).

unlevered beta listed in SIC code 602 is 0.7.[161]  The median unlevered Blume adjusted, Vasicek adjusted and sum betas in SIC code 602 are, respectively, 0.7, 0.7, and 0.6.[162]  Thus, if one were to "eyeball" the unlevered versions of the same betas VanVleet used in his analysis, one would come out to a similar figure as the median raw OLS-based unlevered beta.

The second option, which Hopkins first advanced in his rebuttal report, is to derive a beta from the unlevered betas in the Small Composite group within SIC code 602.  Hopkins proposes using a beta of 0.43 calculated by averaging the unlevered Blume adjusted (0.5), Vasicek adjusted (0.4), and sum (0.4) betas in that group.[163]  Selecting this beta suffers from three problems, however, that persuade me it would be more appropriate to use the median raw-OLS unlevered beta of 0.7.

First, petitioners have provided no persuasive explanation to reconcile the striking difference between the position Hopkins initially advanced in this case and his rebuttal position.  The 0.88 beta Hopkins initially proposed is more than *twice* the size of the beta he later derived from the Small Composite group.  Petitioners' shift to a dramatically lower beta seems arbitrary and outcome-driven.

---

[161] *Industry Cost of Capital* SIC 602.

[162] *Id.*

[163] Hopkins Rebuttal ¶ 27, 31.

Second, in discussing the betas he reviewed and rejected from another source for banks with total assets between $250 million and $750 million, a range that generally corresponds to the asset range of the banks in the Small Composite group ($341 million to $672 million), Hopkins admitted that "the small trading volume in . . . the small publicly listed community banks . . . tends to distort the beta, the raw data beta on the low side."[164] The lack of liquidity for small community banks is consistent with F&M's own experience,[165] and corroborated by data discussed above that was relevant to my decision not to rely on VanVleet's guideline public company analysis.[166]

Third, the D&P Handbook suggests that if one were to rely on data in the Small Composite group to calculate a cost of equity, it would be necessary to use a higher size premium than the 3.87% size premium the parties agreed on here. Specifically, as Hopkins acknowledged, the D&P Handbook suggests the use of size premium close to 6% in that circumstance, which corresponds to the OLS-

[164] Tr. 340 (Hopkins) (discussing betas listed in Appendices H and I of Hopkins' opening report).

[165] *See* JX 58 (reflecting only 39 transfers of F&M stock during six-year period between June 2008 and September 2014).

[166] *See supra.* II.D.

43

based size premium for the tenth decile (5.99%) rather than for the combined ninth and tenth deciles (3.87%) that the parties used.[167]

In contrast to the problems associated with using a beta of 0.43 derived from the Small Composite group,[168] use of a median unlevered beta of 0.7 applicable to all of the banks in SIC code 602 is more consistent with the 0.88 beta from QABA that both parties endorsed at one time, does not suffer from the liquidity challenges endemic to banks in the Small Composite group, and would not require modification of the size premium both parties adopted. For these and the other reasons explained above, I adopt a beta of 0.7.

* * * * *

Based on a risk-free rate of 2.87%, a size premium of 3.87%, an ERP of 6.18%, and a beta of 0.7, the discount rate I will use works out to 11.07%.

### 3. Growth Rate

Hopkins assumes a 4.375% annual perpetual growth rate as opposed to Van Vleet's 3.0% growth rate. I adopt Van Vleet's estimate. "There is considerable

___

[167] Tr. 730-31 (Hopkins); *see also Guide to Cost of Capital* Ex. 4.7.

[168] The D&P Handbook suggests that a Small Composite beta should be paired with a size premium approximating the 5.99% size premium for companies in the 10th decile. This is implied from the D&P Handbook's use of a 5.9% size premium in calculating a 12.0% Small Composite cost-of-equity capital. Adopting a 0.43 beta with a 6.18% ERP and 5.99% size premium results in an 11.52% discount rate, a difference of 45 basis points from the discount rate adopted here.

precedent in Delaware for adopting a terminal growth rate that is a premium, such as 100 basis points, over inflation."[169] Van Vleet's figure also is consistent with the 3.0% annual growth rate projected in F&M's 2012 Strategic Plan,[170] accounts for the bank's "landlocked" state in a county with a declining population and stagnant economy,[171] and comports with the 3% perpetual growth rates this Court has used to value mature companies in several recent cases.[172]

Hopkins' 4.375% terminal rate overlooks the fact that F&M's higher growth in earlier years was largely a result of past overcapitalization. Under Krauland's watch, the bank harnessed the excess capital to generate additional income.[173] By the time of the Merger, however, the bank was nearing its 90% target loan-to-deposit ratio, and its excess capital was reduced.[174] Local expansion also was not

---

[169] *Owen v. Cannon*, 2015 WL 3819204, at *26 (Del. Ch. June 17, 2015).

[170] JX 5 at F&M00007636.

[171] Tr. 132 (Krauland).

[172] *See, e.g.*, *Dell*, 2016 WL 3186538, at *47 (2% rate); *Owen*, 2015 WL 3819204, at *25-26 (3% rate); *Ancestry*, 2015 WL 399726, at *19 (3% rate).

[173] Tr. 88 (Krauland).

[174] *Id.* at 96.

feasible given the bank's geographic constraints.  Hopkins' estimate did not account for any of these limitations.[175]

### 4. Excess Capital

Hopkins estimated F&M's excess capital at $6,796,000,[176] while Van Vleet estimated $4,439,752.[177]  Hopkins assumed a 9% risk-based capital ratio, and then estimated excess capital by taking the difference between 9% of the bank's total assets, and the bank's equity, as of September 30, 2014.[178]  Van Vleet compared F&M to guideline publicly traded banks and FDIC identified peer group banks, and applied their incremental risk-based capital ratios to F&M's risk-weighted assets.[179]  Van Vleet also added an intangible assets amortization tax benefit of $170,709 to F&M's net present value.[180]

I employ Van Vleet's excess capital estimate and tax benefit adjustment for this valuation.  The heart of the disagreement between the experts' excess capital estimates concerns the appropriate level of capital that should be maintained on

---

[175] *Id.* at 448 (Hopkins).

[176] Hopkins Report ¶ 85.

[177] Van Vleet Report ¶ 96.

[178] Hopkins Report ¶¶ 85-87.

[179] Van Vleet Report Ex. C.7.

[180] *Id.* Ex. D.1.

F&M's balance sheet. The 9% ratio Hopkins used is below the 10% ratio that banks typically maintain to remain well-capitalized according to Hopkins' own report, and that Krauland regarded as a limit to prudent lending.[181] Van Vleet persuasively testified that allowing risk-based capital to drop to a minimal capital ratio of 9% would expose it to regulatory intervention and leave it in a "tenuous position."[182] Petitioners offer no substantive rebuttal to this criticism, which further supports using VanVleet's proposed 10% risk-based capital ratio.

\* \* \* \* \*

For the reasons explained above, I adopt the following inputs to determine the fair value of F&M using a discounted net income analysis: twelve-month projected post-closing net income of $5,063,338, an 11.07% discount rate, a 3.0% growth rate, and $4,439,752 in excess capital. These inputs result in a valuation for F&M as of the date of the Merger of $70,564,156, which equates to $91.90 per share based on the 767,799 total shares outstanding.[183]

---

[181] Hopkins Report ¶ 87; Tr. 96 (Krauland).

[182] Tr. 600-01 (Van Vleet).

[183] This valuation exceeds the $85 per share value that seemed acceptable to Gene Dunmire during the Merger negotiations, and falls comfortably in the middle of the $80.50 to $99.10 per share range that Doug Dunmire estimated around the time the Merger was approved. *See supra.* I.D. Although Gene and Doug Dunmire are not experts in corporate valuation, they both have extensive experience with F&M and appear to be sophisticated investors.

### III. CONCLUSION

For the foregoing reasons, petitioners are entitled to $91.90 per share for their shares of F&M and interest at the Delaware legal rate accruing from October 1, 2014, compounded quarterly. The parties are instructed to confer and to submit a final judgment within five business days in accordance with this opinion.

**IT IS SO ORDERED**.